## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

William Prusak, Ronda Rheinscheld, and
Fair Housing Advocates Association

        *Plaintiffs*,

     v.

Levering Management, Inc. and William B.
Levering

        *Defendants*.

Civil Action No. 25-cv-01497

**COMPLAINT**

Jury Trial Demanded

## INTRODUCTION

1. Plaintiffs William Prusak, Ronda Rheinscheld, and Fair Housing Advocates Association ("FHAA") (collectively, "Plaintiffs") bring this action for declaratory, injunctive, and monetary relief against Defendants Levering Management and William B. Levering (collectively, "Defendants") for violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq*. and the Ohio Fair Housing Law, Ohio Rev. Code Ann. § 4112.02(H).

2. Mr. Prusak is a 72-year-old father and grandfather who currently resides at an independent living facility in Mt. Vernon, Ohio. Mr. Prusak lives with HIV, and is therefore a person with a disability for purposes of the FHA and the Ohio Fair Housing Law. Ms. Rheinscheld, Mr. Prusak's daughter, also lives in Mt. Vernon with her husband and children.

3. Until June 2023, Mr. Prusak lived on his own in a two-bedroom apartment in New Albany, Ohio. That changed when Mr. Prusak suffered a fall, with complications that required rehabilitative care. Ms. Rheinscheld drove two hours most days to visit her father while he was hospitalized in Columbus. The distance was hard on the family, and they decided that

Mr. Prusak would move closer to Ms. Rheinscheld in the Mt. Vernon area.

4.      As Mr. Prusak recovered, Ms. Rheinscheld set out to find housing for him, where he could continue living independently while having the option to get services that would make life easier. Due to a housing shortage in the Mt. Vernon area, there were limited options, but Ms. Rheinscheld identified a complex that appeared to be a great fit—The Living Center ("TLC"), an independent living facility owned and managed by Defendants.

5.      TLC checked all the boxes: they had a kitchenette that would allow Mr. Prusak to cook his own meals when he wished to do so, scheduled transportation that would allow him to get to his medical appointments, and a privileged location within walking distance to the YMCA, the library, church, and restaurants, among other amenities in the downtown area. While Ms. Rheinscheld lived within 5 minutes driving distance of TLC, allowing her to easily visit her father, Mr. Prusak would not depend on her to drive him around.

6.      On August 24, 2023, Mr. Prusak and Ms. Rheinscheld toured the TLC facilities and immediately expressed their interest to reserve unit 109, a one-bedroom corner unit. Then-TLC Director Barbara Brenneman explained the requirements: a $100 deposit; a medical certification attesting that Mr. Prusak was eligible for independent living, followed by an in-house assessment with a nurse to confirm the same; and the ability to transfer to and from a wheelchair, if needed. Given that he met all the requirements, Mr. Prusak promptly paid the $100 deposit and proceeded to reserve the unit.

7.      For the next two weeks, Mr. Prusak's tenancy appeared to be on track. Ms. Rheinscheld visited a total of three times, took measurements for a larger fridge, and even set up Mr. Prusak's internet service at the unit. During her third visit, Ms. Rheinscheld noticed that the unit had been reserved for Mr. Prusak with a nameplate installed on the door with his name.

8.     On September 11 and 12, shortly before Mr. Prusak's anticipated discharge, Ms. Rheinscheld provided medical records certifying that Mr. Prusak was eligible for independent living. Those records also disclosed his HIV diagnosis.

9.     Within two days of learning about Mr. Prusak's HIV status, Defendants suddenly changed course and denied him admission. Ms. Rheinscheld and Mr. Prusak, who was preparing to move into unit 109, were startled by TLC's about-face, as the denial came before Mr. Prusak's in-house assessment could be completed, or before he even had the opportunity to provide financial records.

10.     In separate phone calls with Ms. Rheinscheld, Ms. Brenneman and Defendant Mr. Levering offered pretextual reasons for the denial. On September 14, Ms. Brenneman first claimed it was due to a complicated payment arrangement. When Ms. Rheinscheld pushed back, explaining that Mr. Prusak could cover the monthly rental amount, Ms. Brenneman's reason for the denial shifted, claiming that Mr. Prusak needed "more care than they could provide," and that TLC was not the right situation for him. On September 15, Mr. Levering similarly argued at first that the denial was due to a cumbersome financial arrangement. When challenged, he inquired about why Mr. Prusak was not going to assisted living, and did not waver in his decision to deny him.

11.     The reasons provided by Ms. Brenneman and Mr. Levering were all the more suspect given that TLC had not conducted Mr. Prusak's in-house assessment to confirm the accuracy of his medical records (which stated he could live independently), nor had they even given Mr. Prusak the opportunity to provide financial records.

12.     Defendants' unexpected denial, communicated on the very same day Mr. Prusak was ready to be discharged and move to TLC, was devastating for Mr. Prusak and Ms.

Rheinscheld, who were left with no conclusion other than that Mr. Prusak was being unfairly denied based on erroneous and outdated misconceptions about HIV. All of a sudden, Mr. Prusak had nowhere to go, and Ms. Rheinscheld was left to scramble for another option available on extremely short notice.

13.     While Ms. Rheinscheld was ultimately able to find another senior housing facility for Mr. Prusak, it was significantly more expensive than TLC, and it did not fit Mr. Prusak's needs as well.

14.     Defendants' discriminatory actions caused substantial monetary damages to Mr. Prusak and Ms. Rheinscheld, as well as significant emotional distress.

15.     In October 2023, Mr. Prusak and Ms. Rheinscheld reached out to the Fair Housing Advocates Association to seek assistance. Vince Curry, executive director of the FHAA, conducted a preliminary investigation into Defendants' treatment of Mr. Prusak and, potentially, other individuals with HIV. As of December 2023, there are at least 25,690 persons living with HIV in Ohio. Apart from TLC, Defendants own and manage five other senior housing facilities in Ohio.

16.     Mr. Curry concluded that Defendants' six senior housing centers amounted to a healthy share of the already scarce market for senior housing in the area, and that Defendants' discriminatory denial could have an outsized impact on FHAA's ability to provide housing counseling and referrals to seniors with disabilities. Mr. Curry thus felt compelled to conduct a full investigation on the nature of Defendants' policies and practices, and to take steps to counteract them.

17.     Plaintiffs accordingly bring this suit to redress the harm Mr. Prusak, Mr. Rheinscheld, and the FHAA have suffered as a direct result of Defendants' discriminatory

4

conduct, as well as to prevent Defendants from continuing their discriminatory and unlawful conduct.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343 because the claims alleged herein arise under the laws of the United States, including the Fair Housing Act, 42 U.S.C. § 3601 *et seq*. Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202.

19.     This Court has supplemental jurisdiction over Plaintiffs' Ohio law claims pursuant to 28 U.S.C. § 1367 because those claims arise from a common nucleus of related facts and are so related to the federal claims within the original jurisdiction of this Court that they form part of the same case or controversy.

20.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District and Division and Defendants reside in this District.

## PARTIES

21.     Plaintiff William Prusak lives in Mount Vernon, Ohio. Mr. Prusak has a disability based on his HIV-positive status.

22.     Plaintiff Ronda Rheinscheld lives in Mount Vernon, Ohio. Ms. Rheinscheld is Mr. Prusak's daughter and healthcare power of attorney.

23.     Plaintiff Fair Housing Advocates Association ("FHAA") is a not-for-profit organization headquartered in Akron, Ohio. FHAA is dedicated to providing housing assistance to home seekers, housing providers, and homeowners. FHAA works to ensure equal opportunity for all people through counseling, housing referrals, and education programs.

24.     Defendant Levering Management is a for-profit corporation organized under the

laws of the State of Ohio and registered to do business in Ohio, with its principal offices based in Knox County. Defendant William B. Levering lives in Knox County and is the President of Levering Management. By and through its subsidiaries, Levering Management owns, manages, and/or operates The Living Center. In addition, Levering Management owns, manages, and/or operates five other nursing facilities in Ohio.

27. In acting or failing to act as alleged herein, Defendant Levering Management was acting through its employees, officers, and/or agents and is liable on the basis of the acts and omissions of their employees, officers, and/or agents.

26. In acting or failing to act as alleged herein, each employee, officer, or agent of Defendant Levering Management was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as agent were subsequently ratified and adopted by Defendant Levering Management as principal.

## FACTUAL BACKGROUND

27. William Prusak is a 72-year-old father and grandfather who currently lives in Mt. Vernon, Ohio.

28. Mr. Prusak has been retired since 2010. Prior to his retirement, Mr. Prusak worked as a vibrational analysis technician, monitoring industrial machinery at major companies and nuclear plants across the country. Now, Mr. Prusak enjoys exercising, cooking, spending time with his family, and watching movies.

29. Mr. Prusak lives with HIV.

30. Until June 2023, Mr. Prusak lived on his own in a two-bedroom apartment in New Albany, Ohio, where he had lived for nine years.

31. Ms. Rheinscheld, Mr. Prusak's daughter, lives in Mt. Vernon with her husband

6

and children. She first moved to Gambier, 7 miles from Mount Vernon, in 1987. She went to Kenyon College in Gambier and, after spending a few years in other states, eventually moved back to the area that felt like home, marrying her high school sweetheart and starting a family. Apart from taking care of her children, she has regularly worked part time jobs in administration and education.

32.     Ms. Rheinscheld is very close to her father and is the sole familial support for Mr. Prusak in the United States.  She has two brothers, but they live in Costa Rica. While one of her brothers is able to help financially, all in-person support and any physical caregiving is left to Ms. Rheinscheld alone.

33.     In July of 2023, Mr. Prusak suffered a fall, which resulted in several health complications, including sepsis. While Mr. Prusak was hospitalized, Ms. Rheinscheld drove about two hours most days between Columbus and Mt. Vernon to visit Mr. Prusak.

34.     The distance was hard on the family, and Mr. Prusak and his family decided that he should move to Mt. Vernon where he could be closer to his daughter. To fully recover, Mr. Prusak spent time at a rehabilitation facility in Mt. Vernon, Country Club Rehabilitation.

35.     Finding a place to live for Mr. Prusak in the Mt. Vernon area proved to be a challenge. Mt. Vernon has been facing an extensive and growing housing shortage for years.[1] This housing shortage also extends to surrounding areas in Knox County, with senior housing options limited. Ms. Rheinscheld called dozens of senior housing facilities of all kinds and even non-senior apartments all across the area. She drove around all the neighboring cities, going as far as Johnstown, a 40-minute drive, trying to identify available housing opportunities. But options were scarce—the facilities had a long wait list, or Mr. Prusak's income was over the

---

[1] Brian Sellers & Huachen Li, *Knox County, Ohio Forecasted Housing Need 2021*, https://knoxadf.com/wp-content/uploads/2021/10/Knox-County-Housing-Market-Report-2021.pdf.

income limits, or they were otherwise unavailable or unsuitable.

***Mr. Prusak's Application to The Living Center***

36.     As Ms. Rheinscheld considered independent living options in the area, The
Living Center ("TLC"), an independent living facility in Mount Vernon owned and operated by
Defendants, rose to the top of her list. Ms. Rheinscheld first became aware of TLC several years
prior, when she was looking for winter respite care for her grandmother, and while her
grandmother did not end up moving in, Ms. Rheinscheld liked the TLC facilities, food, and
location.

37.     In early August 2023, Ms. Rheinscheld visited TLC with her mother, Mr.
Prusak's ex-wife. They were greeted by Ms. Brenneman, who showed them three available units.

38.     Ms. Rheinscheld found unit 109, a one-bedroom corner unit, to be a great fit for
Mr. Prusak. They were certain that Mr. Prusak would be happy there.

39.     During that visit, Ms. Rheinscheld expressed an interest in reserving a unit for
Mr. Prusak and inquired about the requirements and steps to do so. Ms. Brenneman advised that
Mr. Prusak could reserve the unit by paying $100. She also explained the requirements Mr.
Prusak would have to meet: because he was moving from a rehabilitation facility, he would have
to submit a Medical Certification form provided by TLC to be completed by his doctor to certify
that he was eligible to live independently, followed by an assessment from an in-house nurse. If
he used a wheelchair, he would have to be able to self-transfer to and from his wheelchair, and
no electric wheelchairs were allowed. Ms. Brenneman also explained that Mr. Prusak himself
would have to visit the unit to confirm that he was interested in living there. Ms. Brenneman
gave Ms. Rheinscheld a folder with information about TLC, including an application form
asking for emergency information and medications, which she noted TLC would not need until

8

Mr. Prusak's release from rehabilitation.

40.     Excited and relieved to have found an excellent housing option for her father, Ms. Rheinscheld returned with Mr. Prusak on August 24, 2023 to TLC.  Mr. Prusak loved TLC and unit 109, and confirmed he would like to live there.

41.     In fact, Mr. Prusak and Ms. Rheinscheld considered The Living Center to be the perfect fit for Mr. Prusak for several reasons. *First*, Mr. Prusak wanted to have the flexibility to cook his own meals, and the TLC apartment was one of the only senior housing options with a kitchenette with a two-burner cooktop, while also providing the option to have meals in the dining facilities whenever he wished to do so. *Second*, TLC's location was within walking and accessible distance to the YMCA, the library, church, restaurants, and other attractions in the downtown Mount Vernon Area. Mr. Prusak is unable to drive, but he enjoys working out, going out to eat, watching movies, and going to social events. Being able to walk to these locations would thus give him the freedom to do so on his own. *Third*, TLC offered help setting up health services and scheduled transportation, which would allow Mr. Prusak to go to his medical appointments without depending on Ms. Rheinscheld to drive him. *Fourth*, at TLC, Mr. Prusak could get help with cleaning and laundry if he so chose. *Fifth*, TLC allowed pets, allowing Mr. Prusak to get a cat. *Finally*, TLC is a 5-minute drive for Ms. Rheinscheld, allowing her to easily visit her father.

42.     Given that Mr. Prusak would meet all the admission requirements upon his discharge from the rehabilitation center, Mr. Prusak and Ms. Rheinscheld decided to move forward with reserving a unit at TLC.

43.     On or around August 28, Mr. Prusak paid a $100 deposit to reserve unit 109. Mr. Prusak and Ms. Rheinscheld were pleased to have found a home that met Mr. Prusak's and his

family's needs, and he looked forward to moving there as soon as he completed his rehabilitation.

44.     On September 11, Ms. Rheinscheld visited the unit for a third time and confirmed that Mr. Prusak's tenancy was on track. Ms. Brenneman greeted Ms. Rheinscheld and showed her to unit 109. During that visit, Ms. Rheinscheld took measurements of the unit for a larger fridge and to prepare for her father's move-in. While there, she noticed that the unit had been reserved for Mr. Prusak with a nameplate. Ms. Rheinscheld took pictures of the unit and nameplate and sent them to Mr. Prusak to get him excited about the upcoming move. Ms. Rheinscheld also informed Ms. Brenneman that she would be setting up Mr. Prusak's internet service at the unit. At no point did Ms. Brenneman or anyone at TLC indicate there was any concern or potential issue with Mr. Prusak's tenancy. On the contrary, Ms. Rheinscheld was reassured that Mr. Prusak's tenancy was on track, and she set up an internet account for Mr. Prusak.

***Mr. Prusak Discloses His HIV Status***

45.     Later on September 11, as requested, Ms. Rheinscheld sent Ms. Brenneman medical records certifying that Mr. Prusak was eligible for independent living. First, Ms. Rheinscheld e-mailed Ms. Brenneman a Determination Letter dated September 7, 2023 from Livanta BFCC-QIO, which provides case review services for Medicare beneficiaries, explaining that Mr. Prusak no longer met Medicare coverage requirements for skilled nursing facility services and could transition to at-home physical therapy and occupational therapy services. The letter explained that Mr. Prusak did not have skilled nursing needs, was able to transfer to and from his wheelchair and move around without assistance, and did not need rehabilitative services on a daily basis.

46.     Then on September 12, Ms. Rheinscheld returned to Ms. Brenneman the

completed TLC Medical Certification form signed by Mr. Prusak's doctor at the rehab facility, Dr. Ossa. That Certification made clear that Mr. Prusak could live independently and detailed what out-patient support he might need. The Certification listed "Sepsis, Muscle weakness, DMII, Rhabdomyolysis, HIV" as Diagnosis. It stated that he required skilled therapy, physical therapy, and occupational therapy. Mr. Prusak had recovered from some of the conditions, such as sepsis, and none were disqualifying for independent living. Ms. Rheinscheld asked Ms. Brenneman to "[p]lease review and let me know when it would be convenient for the TLC in-house nurse assessment."

47. Ms. Brenneman confirmed receipt and wrote she would "get with our TLC Nurse" to schedule the in-house assessment of Mr. Prusak. But TLC never scheduled an assessment for Mr. Prusak.

***The Living Center Changes Course and Denies Mr. Prusak***

48. Although for more than two weeks, Mr. Prusak's upcoming tenancy at TLC had been proceeding on pace, with Mr. Prusak and Ms. Rheinscheld visiting the unit several times, submitting a deposit, providing all required materials, and even setting up his internet service at unit 109, two days after learning about Mr. Prusak's HIV status from the requested Medical Certification, TLC suddenly changed course.

49. On September 14, before any in-house assessment could be completed, and before Mr. Prusak could submit any financial or other additional documentation, Ms. Brenneman informed Ms. Rheinscheld in a phone call that TLC was declining admission to Mr. Prusak. This came as a shock to Ms. Rheinscheld, who inquired about the reasons for this unexpected decision.

50. Ms. Brenneman initially claimed that TLC was denying Mr. Prusak due to a

complicated payment arrangement, as Mr. Prusak's son, who lives in Costa Rica, had intended to pay for Mr. Prusak's rent through wire transfers. Ms. Rheinscheld immediately provided a solution, explaining that Mr. Prusak's social security income would cover the entire rent, and his son would wire him money directly to help cover other expenses. Ms. Brenneman's explanation then shifted. She explained that Mr. Prusak needed "more care than they could provide," and added that TLC was not the right situation for him.

51.     In a second phone call on September 15, Ms. Rheinscheld asked for a letter on TLC letterhead documenting why Mr. Prusak was rejected. While Ms. Brenneman initially agreed to provide it, when Ms. Rheinscheld went in person to the TLC office to collect it, Ms. Brenneman claimed she could not provide anything in writing. Ms. Rheinscheld then asked to be contacted by the owner/president of TLC, Defendant William Levering, to discuss the denial.

52.     Ms. Rheinscheld spoke to Mr. Levering that same day, September 15. Mr. Levering initially reverted to the claim that TLC denied Mr. Prusak due to a cumbersome financial arrangement. Ms. Rheinscheld again explained that Mr. Prusak had enough income to cover the rent. Instead of giving Mr. Prusak the opportunity to provide documentation of his ability to pay, Mr. Levering shifted the conversation and asked Ms. Rheinscheld why Mr. Prusak wanted to live at TLC and not assisted living. Ms. Rheinscheld explained that Mr. Prusak wanted to have an option of a kitchen to cook some of his own meals, and that assisted living options with a kitchen option had long waitlists in the county. Mr. Levering was unmoved and would not reconsider the denial. He also refused to provide a letter on letterhead about the decision to decline admission to Mr. Prusak, saying it was "not company policy."

53.     Mr. Prusak's son, Darryl Prusak, then spoke with Mr. Levering to discuss the reasons why Mr. Levering claimed TLC was denying Mr. Prusak. However, Mr. Levering hung

up the phone and did not respond to further calls.

54.     TLC's reasons for denial were pretextual, as Mr. Prusak had sufficient income to pay the rent (as he would have been able to verify had he been given the opportunity), and his medical records certified that he could live independently (as TLC would have also been able to confirm for itself through its usual process had it allowed Mr. Prusak to complete the in-house assessment).

***Defendants' Discriminatory Denial Harmed Mr. Prusak and Ms. Rheinscheld***

55.     Mr. Prusak and Ms. Rheinscheld were devastated by the unexpected denial. They were left to scramble to find another suitable housing alternative for Mr. Prusak to move into upon his impending discharge, originally set for September 14. While Mr. Prusak and Ms. Rheinscheld had everything set for the move, all of a sudden, Mr. Prusak had nowhere to go.

56.     Ms. Rheinscheld had no option but to start from scratch, desperately looking for other facilities that could accommodate Mr. Prusak on short notice in an area with very limited options. Nor could Ms. Rheinscheld accommodate Mr. Prusak in her home, as she did not have any space. Ms. Rheinscheld was ultimately able to find another senior living facility, Brookdale Senior Living, that could accommodate Mr. Prusak. Brookdale cost approximately $1,000 more than TLC per month, and it did not suit Mr. Prusak's needs as well as TLC. But from her initial search, Ms. Rheinscheld knew that options were extremely limited, and with no time to spare, the family saw no option but to move forward with Brookdale.

57.     While they completed the paperwork and readied for the move, Mr. Prusak was forced to extend his stay at the rehabilitation facility for nine days until September 23, incurring more than $5,000 in additional rent and fees in that period alone. Mr. Prusak was finally able to move to Brookdale on September 23, after completing Brookdale's in-house assessment to confirm he was eligible to live independently.

58.     Brookdale drastically undermined Mr. Prusak's independence.  Mr. Prusak's unit at Brookdale was a studio with no kitchen, requiring Mr. Prusak to eat food from the dining hall, which he did not like because it was unhealthy, cold, and often late. Mr. Prusak had less privacy, as Brookdale staff would knock on his door constantly to monitor him and pressure him to go to the dining hall at mealtimes. Brookdale staff also forced upon Mr. Prusak medical services and massage therapies he did not request or need and without consulting with Ms. Rheinscheld, resulting in additional costs and potential health risks. Brookdale was not within walking distance to the downtown area or any of the facilities close to TLC, preventing Mr. Prusak from moving around freely. Unlike TLC, Brookdale provided only limited and unreliable scheduled transportation for two days per week. Because taxi and ride-share services were unavailable in the area, Ms. Rheinscheld was forced to take on the responsibility of driving Mr. Prusak to his medical appointments and to be generally available to transport him wherever he needed to go. This was further exacerbated by the fact that Brookdale was farther from Ms. Rheinscheld's home than TLC.

59.     Mr. Prusak longed for greater independence and proximity to a walkable commercial area—he wanted to cook his own food, to go to the gym, to go out to eat, to access books and movies from the library, and to have the freedom to walk wherever he wanted to go without depending on Ms. Rheinscheld.  But given the extremely limited alternatives in the area, Mr. Prusak had to remain at Brookdale for more than seventeen months.

60.     This was also devastating for Ms. Rheinscheld, who had to remain available to drop everything at a moment's notice to drive Mr. Prusak wherever he needed to go. While Ms. Rheinscheld would have liked to get a part time job, and her family could have financially benefitted from that income, she was unable to do so because she could not find any options that

would allow her the required flexibility to serve as Mr. Prusak's driver.

61. After looking for other housing options for months, Ms. Rheinscheld was able to find a more suitable option at a newly-built independent living facility, Pine Hill Senior Living.

62. Pine Hill provides Mr. Prusak with more independence, allowing him to cook his meals again and do his own laundry, and not forcing upon him unnecessary services and treatments. Still, Pine Hill came at a cost, requiring Mr. Prusak's family to pay $31,800, including a $25,000 deposit, to allow him to move in. And unlike TLC, it does not provide medical transportation, nor is it within walking distance to the downtown area and other attractions. This creates additional, ongoing costs and challenges for Mr. Prusak, whose freedom to walk to places of interest remains limited, and for Ms. Rheinscheld, who continues to bear the costs of having to drive Mr. Prusak to medical appointments and anywhere he needs to go.

63. In addition to bearing the significant monetary costs caused by Defendants' discriminatory denial, Mr. Prusak and Ms. Rheinscheld also suffered significant emotional distress as a result of Defendants' actions.

64. Mr. Prusak felt deeply humiliated by his wrongful denial due to his HIV status. He felt that he was being turned away solely because of false and outdated myths about HIV transmission. He also felt trapped at a place where he had far less independence and freedom to do the things he enjoyed because of his wrongful denial.

65. Ms. Rheinscheld experienced a deep emotional toll caused by TLC's discriminatory denial and the urgent search she had to undertake as a result. Upon TLC's unexpected and discriminatory denial, Ms. Rheinscheld had to drop everything and desperately find a place for her father to live. The added responsibility to drive her father everywhere was also stressful, taking away from her time with her husband and children, and undermining their

financial well-being. Moreover, the ongoing scramble to find and arrange appropriate housing for her father—necessitated by Brookdale's deficiencies as compared to TLC—imposed significant additional strain and time constraints on Ms. Rheinscheld's already substantial responsibilities.

### Housing Discrimination Based on HIV Status

66.     Unfortunately, like Mr. Prusak, individuals with HIV have long experienced housing discrimination. People living with HIV have often been denied housing due to stigma and incorrect beliefs about the communicability of HIV.[2] In a 2015 survey of individuals living with HIV in Los Angeles, for example, 31% of survey respondents reported having experienced discrimination on the basis of their HIV status in housing, employment, or healthcare.[3] And at the national level, one in four people living with HIV have shelter or housing service needs.[4]

67.     In Ohio, there were 25,590 persons living with HIV as of December 31, 2023.[5] Individuals aged 55-64 had the highest rate of HIV diagnoses, at 422.3 per 100,000.[6] As elsewhere, people living with HIV faced increased stigma and discrimination in an already limited housing market.

### FHAA Investigated Mr. Prusak's Denial

---

[2] *Housing Rights of People Living with HIV/AIDS: A Primer*, The Center for HIV Law and Policy (Mar. 2010), https://www.hivlawandpolicy.org/sites/default/files/housingprimer3.10.pdf; Jodi Manz & Mia Antezzo, *How Ohio Coordinates Treatment and Housing Services for People with HIV/AIDS,* National Academy for State Health and Policy (Aug. 8, 2022), https://nashp.org/how-ohio-coordinates-treatment-and-housing-services-for-people-with-hiv-aids/.
[3] Ayako Miyashita et al., *The Legal Needs of People Living with HIV,* UCLA School Of Law Williams Institute (Apr. 2015), https://williamsinstitute.law.ucla.edu/publications/legal-needs-people-living-hiv/.
[4] Sharoda Dasgupta et al., *Needs for Shelter or Housing Assistance Among People with Diagnosed HIV by Jurisdiction: United States, 2015-2020,* Wolters Kluwer Health (Mar. 1, 2023), https://journals.lww.com/aidsonline/abstract/2023/03010/needs_for_shelter_or_housing_assistance_among.16.aspx.
[5] *HIV in Ohio,* Ohio Department of Health (Jun. 30, 2024), https://odh.ohio.gov/wps/wcm/connect/gov/2af5d7eb-b1e3-4df7-bbd2-9fe6c493a8ad/Ohio+HIV+Summary+2023.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_79GCH8013HMOA06A2E16IV2082-2af5d7eb-b1e3-4df7-bbd2-9fe6c493a8ad-pEeSGNX.
[6] *Id.*

68.     Following Mr. Prusak's discriminatory denial, Ms. Rheinscheld reached out to multiple agencies and organizations to seek assistance with what she and her father felt was a discriminatory denial, to no avail. A social worker then recommended that Mr. Prusak and Ms. Rheinscheld contact the Fair Housing Advocates Association.

69.     Ms. Rheinscheld and Mr. Prusak reached out to the FHAA in October 2023 to seek assistance. From October 2023 to the present, Mr. Curry diverted scarce resources to investigate and address Defendants' discriminatory actions.

70.     Mr. Curry met with Mr. Prusak and Ms. Rheinscheld at Brookdale, Mr. Prusak's then-home, to learn more about their experience. He started an investigation of TLC's policies and practices regarding individuals with HIV, reviewing records concerning Mr. Prusak's application and subsequent denial, visiting TLC, and conducting research about the facility and Defendants.

71.     Over the course of this investigation, Mr. Curry learned that apart from TLC, Levering Management owns and operates five other senior housing facilities in Ohio, with more than 400 beds. Levering Management thus accounts for a healthy share of the already limited market for senior housing in the region. Mr. Curry also learned that Defendant Mr. Levering, who denied Mr. Prusak because of his HIV status (and communicated said denial), is the CEO and President of Levering Management, with decision-making power over all its senior housing facilities. Given Levering Management's share of the market and the active role of its President and CEO in its discriminatory decision-making, Defendants' actions have an outsized impact on the availability of housing for elderly people with disabilities, including HIV, in the area. That is, a policy or practice of denying housing to individuals with HIV across Defendants' multiple senior housing facilities makes it substantially harder for FHAA to conduct one of its core

activities—that of referring or counseling any elderly clients with disabilities, including HIV, seeking housing in the area. This impact compelled Mr. Curry to conduct a full investigation to investigate the nature and scope of Defendants' policies.

72.     On April 22, 2024, Mr. Curry contacted TLC with a request for a complete copy of Mr. Prusak's records/files, along with a check for $10 to cover the cost of photocopying and an authorization from Ms. Rheinscheld (Mr. Prusak's healthcare power of attorney) for the release of records.

73.     Mr. Curry also sent TLC informational materials explaining that the Fair Housing Act prohibits discrimination against persons living with HIV/AIDS. Through these efforts, Mr. Curry sought to engage with TLC to learn more about their policies and practices concerning applicants with disabilities, including HIV. But TLC never responded to Mr. Curry's requests and outreach.

74.     Absent a response, in June 2024, Mr. Prusak and FHAA filed administrative complaints before the Ohio Civil Rights Commission ("OCRC"), alleging that Levering Management and Mr. Levering had engaged in discrimination on the basis of disability in violation of both federal and state laws.

75.     OCRC provided Plaintiffs a U.S. Department of Housing and Urban Development ("HUD") Dual Filing Notice, notifying them that OCRC and HUD were cooperating on the investigation, that OCRC would provide the case information to HUD, and that once resolved, it would be considered closed with both HUD and OCRC.

***Ohio Civil Rights Commission's Cause Finding***

76.     After an investigation into Mr. Prusak's and the FHAA's allegations, OCRC issued a Letter of Determination in April 2025, finding it probable that Levering Management and Mr. Levering engaged in unlawful discrimination.

77.     The Commission then reaffirmed its decision in May 2025 by rejecting Levering Management and Mr. Levering's application for reconsideration.

78.     In October 2025, Mr. Prusak and the FHAA withdrew their administrative complaints to pursue their claims through the present action. In November 2025, OCRC accordingly dismissed the administrative proceedings.

## INJURY TO PLAINTIFFS

79.     As a result of Defendants' actions described above, Plaintiffs Mr. Prusak and Ms. Rheinscheld suffered compensatory harm, including out-of-pocket expenses, emotional distress, humiliation, embarrassment, pain and suffering, the injury to dignity associated with being stereotyped based on disability, and other injuries necessarily attendant to discrimination on the basis of disability.

80.     Defendants' discriminatory rejection of Mr. Prusak caused Mr. Prusak and Ms. Rheinscheld to expend significantly more resources to secure housing and to meet Mr. Prusak's attendant needs.

81.     Defendants' actions also caused Mr. Prusak and Ms. Rheinscheld emotional distress, pain, and suffering.

82.     Furthermore, Defendants' unlawful conduct, policies, and practices have inflicted and continue to inflict concrete, particularized, and substantial injuries on Plaintiff FHAA by impairing its mission and by impairing its core activities and programs.

83.     FHAA's mission is to ensure equal housing for all and be a strong voice for fair housing by providing housing assistance to home seekers. This includes ensuring the availability of housing opportunities to individuals with disabilities.

84.     FHAA currently engages in programs and activities in furtherance of its mission. For example, FHAA provides housing counseling and referral services to individuals searching

for housing. Through its counseling work, FHAA connects people with resources to help them locate housing options; to stave off instability; to identify or access available housing programs; and to combat or address conflicts or inequities with their housing providers and/or housing services.

85.     Defendant Levering Management is a major provider of assisted living facilities in FHAA's service area, as in addition to The Living Center, it owns five other nursing facilities in Ohio. Defendant Mr. Levering, who himself led and communicated Mr. Prusak's discriminatory denial, is the CEO and President of Levering Management, with decision-making power over all six nursing homes. Defendants' exclusionary policy or practice of denying housing to applicants like Mr. Prusak on the basis of HIV status, a protected disability, harms the FHAA by impairing its ongoing counseling and referral services for people with disabilities, one of the organization's core activities.

86.     As part of its counseling program, FHAA responds to inquiries from people with HIV status and other disabilities by providing referrals and support in their search for housing. Having a company that controls Defendants' share of an already limited market for senior housing exclude applicants based on disability—HIV status—interferes with the FHAA's ability to carry out its core business activity of counseling and referring people with disabilities, as it significantly reduces the housing options available for FHAA to refer and place seniors with disabilities who come to FHAA for assistance. Although there is a high demand for safe and accessible senior housing in FHAA's service area, especially for seniors with disabilities, Defendants' policies and practices restrict the available housing stock and shrink the rental market for seniors with disabilities.

87.     These injuries are not mere setbacks to FHAA's abstract goals but rather direct

and tangible impediments to FHAA's ability to achieve its mission of ensuring equal housing for all and to provide housing assistance to people seeking homes.

88.     FHAA has suffered further damages because the injuries to its mission and core activities caused a consequent drain on the organization's resources. Given the potential impact of Defendants' discriminatory exclusion, FHAA was compelled to investigate and counteract Defendants' discriminatory policies and practices, and it diverted scarce resources to do so.

89.     FHAA has a small staff of one and a limited budget. Yet because Defendants' actions present an ongoing impairment to FHAA's mission, FHAA diverted staff time and incurred expenses counseling Mr. Prusak and Ms. Rheinscheld; collecting and reviewing documents; conducting research on Defendants and their facilities; and investigating Defendants' policies and practices regarding individuals with HIV. This expenditure of resources was necessary to assess the scope and degree of Defendants' discrimination.

90.     In carrying out activities, for which it had not budgeted time or money, to counteract the harm caused by Defendants, FHAA was forced to divert significant time and funds away from other planned activities. This diversion delayed, diminished, and interfered with FHAA's core operations.

91.     For example, FHAA's investigation into Defendants impaired the organization's ability to respond to inquiries from housing consumers and to provide timely counseling and referral services to clients looking for rental housing, to unhoused persons seeking shelter and/or public housing, to voucher-holders looking for housing that will accept their vouchers, or to renters who are at risk of eviction, among others. FHAA also had to divert resources away from training landlords on fair housing and landlord/tenant issues to ensure that landlords understand their fair housing obligations, that new landlords follow the law (such as by providing templates

21

for leases, information about lead-based paint and other issues, inspection forms, and handbooks and brochures about fair housing and landlord/tenant law), and that they follow proper eviction procedures.

92.     Unless enjoined, Defendants will continue to engage in the unlawful conduct described herein and FHAA's injuries will increase because it will have to continue diverting and curtailing its other activities to counteract Defendants' conduct.

## CAUSES OF ACTION

**Count I – Violation of the Fair Housing Act (42 U.S.C. § 3601 *et seq.*)**

93.     Plaintiffs reallege and incorporate by reference all above paragraphs as if fully set forth herein.

94.     Defendants' actions described in this Complaint amount to unlawful disability discrimination in violation of the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq*.

95.     Plaintiffs are, or are associated with, an individual with a disability within the meaning of the FHA, 42 U.S.C. § 3602(h).

96.     Defendants injured Plaintiffs in violation of the FHA by, among other acts:

    i.   Discriminating or otherwise making housing unavailable because of a disability, in violation of 42 U.S.C. § 3604(f)(1); and/or

    ii.  Discriminating in the terms, conditions, and privileges of the rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of disability, in violation of 42 U.S.C. § 3604(f)(2).

97.     Defendants' acts in violation of the FHA caused Plaintiffs' injuries as detailed above.

**Count II – Violation of the Ohio Fair Housing Law (Ohio Rev. Code Ann. § 4112.02(H))**

98.     Plaintiffs reallege and incorporate by reference all above paragraphs as if fully set forth herein.

99.     Defendants' actions described in this Complaint amount to unlawful disability discrimination in violation of Ohio Rev. Code § 4112.02(H).

100.     Plaintiffs are, or are associated with, individuals with a disability within the meaning of Ohio Rev. Code § 4112.01(A)(13).

101.     Defendants' acts as described herein violate Ohio Rev. Code § 4112.02(H) by, among other acts:

      i.     Discriminating in the rental of, or otherwise making unavailable housing accommodations because of a disability, in violation of Ohio Rev. Code § 4112.02(H)(15); and/or

     ii.     Discriminating in the terms, conditions, and privileges of the sale or rental of housing accommodations, or in the provision of services or facilities in connection with such housing accommodations, because of disability, in violation of Ohio Rev. Code § 4112.02(H)(16).

102.     Defendants' acts in violation of Ohio law caused Plaintiffs' injuries as detailed above.

**JURY DEMAND**

103.     Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues triable as of right.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that the Court grant them the following relief:

    A.     Enter declaratory judgment finding that the foregoing actions of Defendants

violate the Fair Housing Act, 42 U.S.C. § 3601 *et seq*. and Ohio Rev. Code § 4112.02(H);

B.    Enter a permanent injunction directing Defendants and their affiliates, subsidiaries, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future. Such affirmative relief should include, but not necessarily be limited to, the elimination of any and all policies or practices excluding individuals with HIV from The Living Center;

C.    Award Plaintiffs Mr. Prusak and Ms. Rheinscheld compensatory damages in an amount to be determined by the jury that would fully compensate them for their economic losses, emotional distress, humiliation, embarrassment, pain and suffering, deprivation or their housing and civil rights, reputational harm, and any other damages that have been caused by the conduct of Defendants alleged herein;

D.    Award Plaintiff FHAA compensatory damages in an amount to be determined by the jury that would fully compensate it for its frustration of mission, out-of-pocket costs, diversion of resources, and any other damages that have been caused by the conduct of Defendants alleged herein;

E.    Award punitive damages to Plaintiffs in an amount to be determined by the jury that would punish Defendants for the willful, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

F.    Award Plaintiffs their reasonable attorneys' fees and costs; and

G.    Order such other relief as this Court deems just and equitable.

24

Dated: December 22, 2025

Respectfully Submitted,

/s/ Tara Ramchandani
Tara Ramchandani
Valerie Comenencia Ortiz*
RELMAN COLFAX PLLC
1225 19th Street, NW, Suite 600
Washington, DC 20036
Phone: (202) 728-1888
tramchandani@relmanlaw.com
vcomenenciaortiz@relmanlaw.com

*Attorneys for Plaintiffs*

* *Pro hac vice* Motion to be submitted